FILED

2024 Mar-26  PM 12:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| KENNETH MONCRIEF, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:22-cv-01085-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER
## AFFIRMING THE DECISION OF THE COMMISSIONER

Pursuant to 42 U.S.C. § 405(g), Plaintiff Kenneth Moncrief, Jr. appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for disability benefits.  Doc. 1.  Plaintiff Moncrief applied for disability benefits with an alleged onset date of November 25, 2016.  Doc. 9-4 at 18, 20; Doc. 9-6 at 2.  The Commissioner denied Moncrief's claim for benefits.  Doc. 9-3 at 2–6, 13–26.  In this appeal, the parties consented to magistrate judge jurisdiction.  Doc. 13; 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73.

After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

## ISSUES FOR REVIEW

In this appeal, Moncrief argues that substantial evidence does not support the

decision of the Administrative Law Judge (ALJ), because the ALJ incorrectly discredited Moncrief's evidence—including Moncrief's subjective testimony—that he suffered from disabling seizures.  Doc. 16 at 12–17.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages:   (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council.  *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the

administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled.  The ALJ must determine the following:

(1)     whether the claimant is engaged in substantial gainful activity;

(2)     if not, whether the claimant has a severe impairment or combination of impairments;

(3)     if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)     if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)     if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211.  At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).  If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.*  So, while the burden temporarily shifts

3

to the Commissioner at step five, the overall burden of proving disability always remains on the claimant.  *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act.  The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards."  *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.**   With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'"  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner.  *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar).  If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings."  *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d

4

at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).  "The ALJ must rely on the full range of evidence . . . , rather than cherry picking records from single days or treatments to support a conclusion." *Cabrera v. Commissioner of Soc. Sec.*, No. 22-13053, 2023 WL 5768387, at *8 (11th Cir. Sept. 7, 2023).

**B.**  With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.    Moncrief's personal and medical history

Moncrief was born on July 16, 1973.  Doc. 9-6 at 2.

On October 20, 2016, Moncrief presented to Whatley Health Services, Inc. with severe anxiety and depression symptoms that had begun three weeks earlier after his wife left him.  Doc. 9-8 at 88.  Moncrief was prescribed Paxil for his depression and anxiety.  Doc. 9-8 at 93.

On November 25, 2016, Moncrief presented to the emergency department of

the Princeton Baptist Medical Center in Birmingham, Alabama, after he had been in a motor vehicle accident caused by running off the road due to a seizure.  Doc. 9-8 at 6–10.  Moncrief reported that he had experienced 1 prior seizure 1.5 years before and had been placed on seizure medication, but he was not taking the seizure medication at the time of his accident.  Doc. 9-8 at 10.  Moncrief reported a headache but no other injuries.  Doc. 9-8 at 10.  Moncrief's seizure was qualified as "moderate" and its progression "resolved," but other details were reported as "unknown" or "unable to specify."  Doc. 9-8 at 10.  A review of Moncrief's systems was normal except for seizure and headache; he also reported no confusion.  Doc. 9-8 at 10–15.  Moncrief had a past diagnosis of depression.  Doc. 9-8 at 11.  Moncrief was prescribed Keppra (levetiracetam) for seizures and was referred to a neurologist. Doc. 9-8 at 15.

On November 29, 2016, Moncrief reported to the emergency department at St. Vincent's Hospital in Birmingham, Alabama, complaining of a headache.  Doc. 9-8 at 44–45.  Moncrief was prescribed tramadol for pain.  Doc. 9-8 at 46. Moncrief's examinations were normal, including normal orientation and speech, absent his headache and some mild chest pain.  Doc. 9-8 at 46–48.  Moncrief stated that he had not been taking his seizure medication prior to his recent seizure and car accident because he "did not like them" and felt that he "did not need them."  Doc. 9-8 at 47.  Moncrief was informed that he could not drive for six months.  Doc. 9-8

at 48.

On December 8, 2016, Moncrief presented at Whatley Health Services, Inc. for seizure follow-up and depression. Doc. 9-8 at 83. Moncrief reported that he had stopped his seizure medication after his first seizure because he thought the first seizure was caused by grief. Doc. 9-8 at 83. Moncrief stated that he had an MRI of his brain that was normal, but that he could not drive due to his seizures, so he was out of work and needed FMLA paperwork. Doc. 9-8 at 83. Moncrief's depression was fairly controlled and his initial symptoms had improved, but he reported that functioning was "somewhat difficult" and that he had depressed mood, trouble sleeping and with excessive worry, and associated headache. Doc. 9-8 at 83. Moncrief was taking medication and seeing a counselor. Doc. 9-8 at 83. Moncrief was directed to continue taking levetiracetam for his seizures and Paxil for depression. Doc. 9-8 at 87.

On January 26, 2017, Moncrief presented at Whatley Health Services, Inc. for acute sinus pain and follow-ups for depression and seizures. Doc. 9-8 at 78. Moncrief's depression was fairly controlled and had improved since its onset, but he reported that functioning was "somewhat difficult," and that he had trouble sleeping and with excessive worry, but that he was improving. Doc. 9-8 at 78. Moncrief reported that his seizures began 3 years earlier, and that he had only suffered 2 seizures. Doc. 9-8 at 78. His seizures were identified as primarily generalized tonic-

clonic seizures (causing loss of consciousness), and Moncrief stated that he had taken levetiracetam with good results.  Doc. 9-8 at 78.  Moncrief reported that he had lost his job after his November 2016 seizure because he could not drive, which added to his depression.  Doc. 9-8 at 78.  Moncrief was directed to continue taking levetiracetam for his seizures and Paxil for depression.  Doc. 9-8 at 82.

On February 6, 2017, Moncrief saw Dr. Tyler Gaston, an epilepsy neurologist at UAB Hospital in Birmingham, Alabama, to assess his seizures.  Doc. 9-9 at 40. Moncrief reported that he had had 3 seizures 20 years prior while he was taking Wellbutrin, but thought the Wellbutrin caused the seizures.   Doc. 9-9 at 40. Moncrief reported a seizure during a stressful time 3 years prior, and reported that he "lost time" during his seizures.  Doc. 9-9 at 40.  Moncrief also reported frequent moderate-to-severe headaches and stated that he was under significant stress.  Doc. 9-9 at 40.  Moncrief's examination was normal, and he stated that he was tolerating his medication well.  Doc. 9-9 at 42.  Dr. Gaston noted that Moncrief's Paxil dosage had been increased, which had helped his depression.  Doc. 9-9 at 42.  Dr. Gaston directed Moncrief to continue taking levetiracetam and to have an EEG and MRI. Doc. 9-9 at 42.

On March 15, 2017, Moncrief underwent an EEG "to detect evidence of possible seizures."  Doc. 9-9 at 38.  The results of the EEG were "mildly abnormal due to excessive fast activity, which is likely a medication effect."  Doc. 9-9 at 38.

On April 21, 2017, Moncrief presented at Whatley Health Services, Inc. for follow-ups for his depression and seizures.  Doc. 9-8 at 74.  Moncrief reported that he had been experiencing moderate depression for about a year with daily symptoms that were chronic and "fairly controlled"; he reported feeling better and taking medication every day.  Doc. 9-8 at 74.  Moncrief reported that his last seizure was November 25, 2016, that the seizure was generalized, and that he was taking levetiracetam with good results and no side effects, though his condition was aggravated by stress.  Doc. 9-8 at 74.  Moncrief was directed to continue taking levetiracetam for his seizures and Paxil for depression.  Doc. 9-8 at 77.

On August 15, 2017, Moncrief saw Dr. Gaston for his seizures.  Doc. 9-9 at 34.  Moncrief was seizure-free since his previous visit and his headaches had improved but still occurred about every 3 days.  Doc. 9-9 at 34.  Moncrief had fatigue but was not experiencing other medication side effects.  Doc. 9-9 at 34.  His anxiety and depression had improved somewhat.  Doc. 9-9 at 34.  Dr. Gaston encouraged Moncrief to seek other treatment for his depression and advised Moncrief that he could not drive.  Doc. 9-9 at 36.

On August 15, 2017, Moncrief underwent an MRI of his brain that showed "subtle blurring of the gray-white differentiation of the hippocampal internal architecture on the left side."  Doc. 9-9 at 32.

On March 20, 2018, Moncrief saw Dr. Gaston for his seizures.  Doc. 9-9 at

25.  Dr. Gaston noted that Moncrief reported that he had seizures on March 4, 2018, and on February 6, 2018; during those events he woke up on the floor, but no one witnessed the seizures and he had no incontinence or tongue biting.  Doc. 9-9 at 25. Moncrief reported that he was sore all over after the seizures.  Doc. 9-9 at 25.  He stated that he was taking his mediation and did not have side effects, and that his mood had improved but he was still under stress as a single parent.  Doc. 9-9 at 25–26.  Because Moncrief had new seizures while taking levetiracetam, Dr. Gaston added LTG seizure medication and suggested an epilepsy unit study for a definitive seizure diagnosis.  Doc. 9-9 at 27.  Dr. Gaston also suggested that Moncrief establish care with a primary care provider.  Doc. 9-9 at 27.

On November 13, 2018, Moncrief saw Dr. Gaston again for his seizures.  Doc. 9-9 at 21.  Moncrief reported 2 seizures since his last visit, 1 in October and 1 in November.  Doc. 9-9 at 21.  Moncrief reported that when he took LTG he did not have any energy, so Dr. Gaston switched him to a new medication, lacosamide (LCM), to accompany his levetiracetam.  Doc. 9-9 at 21.  Dr. Gaston noted that Moncrief "denies depression today but suspicion that depression is contributing to a lot of his reported symptoms."  Doc. 9-9 at 23.  Dr. Gaston also recorded that Moncrief had undergone an epilepsy unit study in 2018 that was normal.  Doc. 9-9 at 23.

On September 4, 2019, Moncrief saw Dr. Raymond Hunt, a primary care

provider at UAB.  Doc. 9-9 at 16.  Moncrief reported that he had headaches once or twice per week.  Doc. 9-9 at 16.  Moncrief reported that he had full body seizures that caused him to stop breathing and said he had experienced up to 20 seizures since his car accident and could not drive, but his last known seizure was in June.  Doc. 9-9 at 16.  Dr. Hunt made no changes to Moncrief's seizure medication.  Doc. 9-9 at 16.  Moncrief reported that he had a lack of energy for daily activities, that life was "getting harder," and that he had trouble sleeping and was not eating much.  Doc. 9-9 at 15.  Dr. Hunt prescribed an increased dose of Paxil.  Doc. 9-9 at 17.

On October 16, 2019, Moncrief saw Dr. Hunt, complaining of migraines, depression, and wrist pain.  Doc. 9-9 at 12.  Moncrief's depression was mildly improved, but Moncrief remained "very depressed" and was experiencing significant stress.  Doc. 9-9 at 12.

On December 8, 2020, Moncrief saw Dr. Gaston for his seizures.  Doc. 9-9 at 5.  He reported that he had had seizures in May and had 2 more in the fall.  Doc. 9-9 at 5.  Moncrief stated that he had headaches and nosebleeds prior to the seizures, though he also had nosebleeds other times.  Doc. 9-9 at 5.  Moncrief reported that his mood was "not great" because of financial stress, and said that he was still taking Paxil.  Doc. 9-9 at 5.  Dr. Gaston suggested that Moncrief would likely benefit from therapy.  Doc. 9-9 at 6.

On January 29, 2021, Moncrief filled out a disability report stating that he

suffered from seizures, migraines, high blood pressure, and depression.  Doc. 9-7 at 6.  Moncrief reported that he stopped working on November 25, 2016, because of his conditions.  Doc. 9-7 at 6.  Moncrief stated that he was taking Paxil for depression, Topamax as a sleep aid, and Vimpat (LCM) for seizures.  Doc. 9-7 at 8.

On February 23, 2021, Moncrief filled out a seizure questionnaire.  Doc. 9-7 at 23.  Moncrief stated that he had suffered from seizures "all [of his] life," and that they started when he was young, but that he was not sure exactly when.  Doc. 9-7 at 23.  Moncrief stated that his seizures happened unexpectedly, lasted for 5 to 20 minutes, and occurred every 3 to 5 months.  Doc. 9-7 at 23.  Moncrief stated that he called his doctor every time he had a seizure, and that he thought his last seizure had been in December 2020.  Doc. 9-7 at 23.  He stated that after a seizure all of his muscles were sore and tight and he needed to spend the day in bed.  Doc. 9-7 at 23.

On February 27, 2021, Moncrief submitted an adult function report.  Doc. 9-7 at 27.  Moncrief stated that he lives in a house with his 3 children.  Doc. 9-7 at 27.  Moncrief stated that his seizures limit his ability to work because he does not know when he will have a seizure, and if he were working with a machine and had a seizure someone could get hurt.  Doc. 9-7 at 27.  Moncrief stated that, on a typical day, he helped his children get ready for school and helped with their homework, his oldest daughter helped him cook dinner, and he helped his younger children take baths.  Doc. 9-7 at 28.  Moncrief stated that he and the children took care of pets, and that

12

he had no problem with personal care.  Doc. 9-7 at 28.  He stated that cooking dinner took no more than an hour and that he tried to have someone with him in case of a seizure.  Doc. 9-7 at 29.  Moncrief stated that his children helped with housework and yardwork for a few hours per week, but sometimes he had headaches and could not do chores.  Doc. 9-7 at 29.  He stated that he does not drive or go places alone in case he has a seizure.  Doc. 9-7 at 30.  Moncrief stated that he shopped for food and could handle finances, though his family did not have money coming in.  Doc. 9-7 at 30.  Moncrief stated that his illness affected his ability to walk and complete tasks, that he did not like walking alone, and that he could not pay attention for long or finish what he started.  Doc. 9-7 at 32.  He stated that he could follow written and spoken instructions and get along with authority figures but was not good at handling stress.  Doc. 9-7 at 32.

On March 6, 2021, Barbara Chance, Moncrief's ex-mother-in-law, filled out a third-party function report.  Doc. 9-7 at 38.  Chance stated that Moncrief lives less than 50 yards from her and that she helps take care of his children.  Doc. 9-7 at 38.  Chance stated that Moncrief could not drive or operate equipment due to seizures and sometimes had problems with memory and comprehension.  Doc. 9-7 at 38.  Chance stated that Moncrief takes care of his three children, but has a lot of help from family, and stated that he sometimes takes care of his pet dogs, but the children often care for the dogs.  Doc. 9-7 at 39.  Chance stated that Moncrief sometimes

suffers from headaches.  Doc. 9-7 at 39.  She stated that he had no problem with personal care and sometimes made meals, though he often ate at her house due to fear of a seizure.  Doc. 9-7 at 40.  Chance stated that Moncrief could do chores including mow the grass on a riding mower if someone was around to watch him, but that he needed encouragement to do chores because of his depression, and that it took him longer to do tasks than it had in the past.  Doc. 9-9 at 40.  She stated that he was unable to drive, but shopped for groceries and could handle finances when he had money, though he had to keep meticulous notes to prevent him from forgetting things.  Doc. 9-7 at 41.  Chance stated that Moncrief sometimes had difficulty comprehending written and spoken instructions, but got along very well with authority figures and had never been fired for failing to get along with people.  Doc. 9-7 at 44.  She stated that he did not "initially" handle stress well but could handle it well "as it arises" with family support, and that he could usually handle changes in routine.  Doc. 9-7 at 44.

On March 9, 2021, Moncrief saw Dr. Gaston for his seizures.  Doc. 9-9 at 46.  He reported no seizures since his last visit, and said he was tolerating his medication relatively well but felt shaky.  Doc. 9-9 at 46.  Moncrief reported that his headaches were increasing and that he still had some depression that Paxil had not helped.  Doc. 9-9 at 46.  Dr. Gaston noted that Moncrief had had several lifetime seizures and had "significant worsening in seizure frequency since November 2016, despite

14

aggressive medication titration."  Doc. 9-9 at 47.  Dr. Gaston noted that Moncrief initially had a good response to medication, but seizures had returned, and that Moncrief had worsening headaches and shakiness that might be attributable to seizure medication.  Doc. 9-9 at 47.

In April 2021, Moncrief underwent an adult mental examination with William Higgs, a licensed professional counselor.  Doc. 9-10 at 3.  Higgs noted that Moncrief had a long history of depression, and that Moncrief tended to be "uncomfortable around most people."  Doc. 9-10 at 3.  Moncrief told Higgs that he had been taking Paxil, and that it helped with his depression, but that he thought his dosage might need to be increased.  Doc. 9-10 at 3.  Moncrief had never been hospitalized for his depression.  Doc. 9-10 at 3.  Moncrief reported suffering from seizures and headaches.  Doc. 9-10 at 3.  Moncrief arrived on time to the appointment and presented normally, though he said he felt "like crap" because of a migraine and had a sad and tired affect.  Doc. 9-10 at 4.  Moncrief's evaluation was "indicative of not having significant cognitive impairment," and he was generally well oriented other than not knowing the date.  Doc. 9-10 at 4.  Higgs opined that Moncrief's insight and judgment were fair, and his intelligence was "probably in the average to low average range" based on his impression.  Doc. 9-10 at 5.

Moncrief told Higgs that he tends to sleep a lot, does household chores with his children's help, and lives in a house owned by his mother-in-law.  Doc. 9-10 at

5.  He stated that his daughter did most of the cooking because he was afraid due to his seizures, and that his mother-in-law accompanied him on errands and transported the children.  Doc. 9-10 at 5.  Moncrief stated that he takes care of two dogs.  Doc. 9-10 at 5.  Higgs diagnosed Moncrief with depression and stated that his prognosis was "guarded" without expectation of significant improvement in the next 6 to 12 months.  Doc. 9-10 at 5.

Higgs opined that, because of his psychological issues, Moncrief experienced moderate functional impairments in the following areas:  the ability to maintain attention/concentration and pace for at least 2 hours; the ability to maintain regular work attendance without missing more than 1 to 2 days monthly due to psychological signs or symptoms; the ability to appropriately accept instructions and criticism from supervisors; the ability to maintain socially appropriate appearance, behavior, and other aspects of social interaction in a workplace; and the ability to manage personal finances reliably and independently.  Doc. 9-10 at 6.  Higgs opined that, because of his psychological issues, Moncrief experienced mild functional impairments in the following areas:  the ability to manage basic self-care; the ability to understand, carry out, and remember short, simple instructions; the ability to maintain a regular schedule with appropriate punctuality; and the ability to sustain an ordinary work routine without the need for special supervision.  Doc. 9-10 at 6.

On April 6, 2021, Moncrief had a brain MRI for worsening headaches, falls,

16

and a history of seizures.  Doc. 9-10 at 15.  The MRI was largely normal except for "[a] few nonspecific small FLAIR hyperintense lesions."  Doc. 9-10 at 15.

On April 29, 2021, Moncrief saw Dr. Robert Pearlman at UAB for evaluation of his headaches.  Doc. 9-10 at 12.  Moncrief reported having headaches more than 15 days per month, and stated that he did not know what triggered them, but that he was under significant stress.  Doc. 9-10 at 12.  Dr. Pearlman prescribed gabapentin and Amerge for symptomatic relief.  Doc. 9-10 at 14.

On August 10, 2021, Moncrief saw nurse practitioner Donna Williams at UAB Psychiatry for a telephonic visit for major depressive disorder.  Doc. 9-11 at 7–9.  Moncrief was still suffering symptoms of depression but declined a change to his medication.  Doc. 9-11 at 8.

On June 22, 2021, Moncrief saw Dr. Gaston for his seizures.  Doc. 9-11 at 24.  Dr. Gaston noted that Moncrief "recently suffered a seizure," and that they had increased his LCM medication to 200 mg—which had helped—but that the increase came with increased shakiness as a side effect.  Doc. 9-11 at 25.  Because of the LCM side effects, Dr. Gaston prescribed Moncrief ZNS for his seizures to hopefully accompany a lower dose of LCM.  Doc. 9-11 at 26.  Dr. Gaston discussed epilepsy surgery, but noted that Moncrief would need to complete another epilepsy unit study beforehand.  Doc. 9-11 at 27.  Moncrief was directed to contact the office if he were interested.  Doc. 9-11 at 27.

On June 24, 2021, Moncrief saw Dr. Pearlman for headaches precipitated by stress and environmental factors. Doc. 9-11 at 21. Dr. Pearlman noted that Moncrief was sullen and depressed but was taking less Paxil than recommended due to a pharmacy error. Doc. 9-11 at 21. Moncrief stated that Amerge had not helped his headaches, so he was directed to take gabapentin, Toradol, and a higher dose of Paxil. Doc. 9-11 at 21–23.

On November 2, 2021, Moncrief saw Dr. Gaston for his seizures. Doc. 9-11 at 16. Moncrief reported that he had suffered a "couple" of seizures since his last visit in June. Doc. 9-11 at 16. Moncrief had started taking ZNS for his seizures, but it caused digestive upset; Dr. Gaston reduced Moncrief's LCM back to 150 mg due to the side effect of shakiness. Doc. 9-11 at 16–18. Dr. Gaston noted that it was recommended that Moncrief participate in another epilepsy unit study, but Moncrief was unable to do so at that time. Doc. 9-11 at 18. Dr. Gaston also discussed epilepsy surgery with Moncrief, and Moncrief said that he would notify the office if he were interested. Doc. 9-11 at 18.

## B.    Social Security proceedings

### 1.    Initial application and denial of benefits

On September 20, 2019, an ALJ entered an unfavorable decision on a prior application for benefits that Moncrief filed in May 2017, alleging disability due to seizures beginning November 25, 2016. Doc. 9-4 at 2–14.

On January 29, 2021, Moncrief again filed for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB), alleging disability based on epilepsy. Doc. 9-6 at 2–18; Doc. 9-4 at 18, 20.  On April 13, 2021, Moncrief's application for benefits was denied at the initial level on the basis of a finding that he would have some limitations—including some moderate social limitations—and could benefit from a flexible schedule as he would be expected to miss 1 to 2 days of work per month, but Moncrief would be able to work and was not disabled.  Doc. 9-4 at 18–37.

On April 20, 2021, Moncrief sought reconsideration of the initial denial of his application for benefits.  Doc. 9-5 at 12.  On August 11, 2021, Moncrief's application was denied at the reconsideration level.   Doc. 9-4 at 38–57.

On August 16, 2021, Moncrief requested a hearing before an ALJ (Doc. 9-5 at 27–28), and a telephonic hearing was held on January 11, 2022 (Doc. 9-3 at 44–45).

On February 10, 2022, the ALJ issued an unfavorable decision.  Doc. 9-3 at 21–37.

### 2.    ALJ hearing

On January 11, 2022, the ALJ held a telephonic hearing on Moncrief's application for disability benefits.  Doc. 9-3 at 44–45.  Moncrief testified that he was previously employed as a plumber.  Doc. 9-3 at 47–48.  Moncrief testified that he

had been receiving mental health counseling tele-visits once per month for about a year, though the sessions only lasted "five minutes maybe."  Doc. 9-3 at 48–49. Moncrief testified that he is a single parent to 3 children—ages 9, 10, and 14—all of whom live with him.  Doc. 9-3 at 49–50.  Moncrief testified that he does not drive because he had car accidents in 2014 and 2016 due to seizures.  Doc. 9-3 at 49. However, he said that he had driven himself to the hospital about a year prior to the hearing and did have a driver's license.  Doc. 9-3 at 50.

Moncrief testified that his seizures started when he was 40 years old while he was under a lot of stress.  Doc. 9-3 at 51.  In response to questioning from his attorney, Moncrief testified that he was still suffering from seizures and had suffered 2 seizures within the last month on December 4, 2021, and December 5, 2021.  Doc. 9-3 at 52.  He stated that his doctor did not feel like his seizures were improving, and that his medication had been changed three or four times, but he was still having seizures.  Doc. 9-3 at 52.

Moncrief testified that his seizures vary in terms of timing; he reported having 4 seizures in October 2021 and then none until December 2021, and reported that he had been having the seizures since 2016.  Doc. 9-3 at 52.  Moncrief testified that, according to records that he kept, he had 2 seizures in July 2021, 1 seizure in August 2021, 4 seizures in October 2021, 2 seizures in November 2021, 2 seizures in December 2021, and none so far in January 2022.  Doc. 9-3 at 53.  Counsel asked

Moncrief to describe his seizures, and Moncrief testified that when he has a seizure he is "completely out."  Doc. 9-3 at 54.  He stated that during one seizure he passed out across a table and then fell to the floor, which bruised his ribs and "busted [his] mouth and broke [his] teeth."  Doc. 9-3 at 54.

Counsel asked Moncrief how long it took Moncrief to get back to normal after a seizure.  Doc. 9-3 at 54.  Moncrief testified that his muscles are sore from cramping so that he "can't function" and must lie down, and that it "takes a while" for his head to "get back to normal."  Doc. 9-3 at 54.  He testified that he could not function because his head was pounding and he had bad headaches that took a day or two for him to overcome.  Doc. 9-3 at 55.  He testified that he was still "real sore" a day after a seizure and tended to feel "hazy."  Doc. 9-3 at 55.  Moncrief testified that he was mostly normal by the third day after a seizure, so it took at least two days to get over each seizure.  Doc. 9-3 at 55.

Moncrief testified that he was taking his seizure medication regularly.  Doc. 9-3 at 55–56.  Moncrief testified that, if it were not for his seizures, he thought he would be able to work.  Doc. 9-3 at 56.

The ALJ confirmed that Moncrief's testimony was that he had suffered 11 seizures since July 2021, and then asked if Moncrief ever called an ambulance for his seizures; Moncrief testified that he did not because he could not leave his children alone.  Doc. 9-3 at 56–57.  The ALJ asked why Moncrief did not think his mother-

in-law, who lived nearby and helped take care of the children, could have stepped in, and Moncrief testified that his mother-in-law had suffered 3 strokes and was 78 years old.  Doc. 9-3 at 57.  Moncrief testified that he did not receive medical attention when he hit his head and broke his teeth.  Doc. 9-3 at 57.

Vocational Expert (VE) Robert Piper testified that a hypothetical individual with Moncrief's age, education, work experience, and the limitations posed by the ALJ could not perform Moncrief's past relevant work as a plumber.  Doc. 9-3 at 57–59.  Piper testified that such a hypothetical individual could perform jobs such as linen room attendant, laundry worker I, and sorter I.  Doc. 9-3 at 59–60.  Piper testified that, in his experience, in order to remain employed, an employee could be off-task for 10% of the day and needed to be absent less than an average of 2 days per month.  Doc. 9-3 at 60.

Moncrief's counsel asked Piper whether, assuming that someone had seizures at least once per month that caused him to be unable to concentrate fully for at least two days, and sometimes had multiple such seizures per month, that person would be able to perform any jobs in the national economy.  Doc. 9-3 at 61.  Piper responded that someone with that condition could not work because someone with that many absences would not be able to maintain employment.  Doc. 9-3 at 61.

During counsel's closing argument, counsel asserted that the fact that Moncrief did not go to the doctor for all of his seizures should not be dispositive.

Doc. 9-3 at 62.  The ALJ responded, "I agree with that . . . but he had it to where he broke his teeth out and didn't go when he was testifying."  Doc. 9-3 at 62.

### 3.    ALJ decision

On February 10, 2022, the ALJ entered an unfavorable decision.  Doc. 9-3 at 21–37.  In the decision, the ALJ found that Moncrief met the requirements for insured status through December 31, 2021.  Doc. 9-3 at 25.  "After careful consideration of all the evidence," the ALJ concluded that Moncrief "has not been under a disability within the meaning of the Social Security Act from November 25, 2016, through the date of this decision."  Doc. 9-3 at 25.

The ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Winschel*, 631 F.3d at 1178).  Doc. 9-3 at 25–26.  The ALJ found that Moncrief was insured through December 31, 2021, that he had not engaged in substantial gainful activity since his alleged onset date of November 25, 2016, and that Moncrief had severe impairments of "seizures, depression, anxiety, and migraine headaches."  Doc. 9-3 at 26.  The ALJ found that Moncrief did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the applicable Social Security regulations.  Doc. 9-3 at 27–28.  The ALJ considered Moncrief's epilepsy under Listing 11.02, and found that review of Moncrief's records showed that he did not have seizures at the required frequency to meet the listing, and that evidence existed

of times of noncompliance with his seizure medication regimen, in contravention of the listing's requirement of adherence to prescribed treatment. Doc. 9-3 at 27. The ALJ found that Moncrief had moderate limitations in understanding, remembering, or applying information, had mild limitations in interacting with others, had moderate limitations in ability to concentrate, persist, or maintain pace, and had no limitations in ability to adapt or manage himself. Doc. 9-3 at 28.

The ALJ determined Moncrief's RFC (or residual functional capacity), finding that Moncrief could "perform medium work," except that he was unable to frequently reach, handle, finger, and feel; could occasionally climb ramps but never stairs; could never climb ladders, ropes or scaffolds; could balance, stoop, kneel, crouch, and crawl without restriction; had to avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, poor ventilation, and vibration; could never work at unprotected heights; could never work with or near dangerous machinery or equipment; could never operate motorized vehicles as a work requirement; could not do work that required fast paced production; and could perform simple goal oriented tasks with simple instructions. Doc. 9-3 at 29. The ALJ stated that the ALJ had considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." Doc. 9-3 at 29. The ALJ also stated that the ALJ had considered any medical opinions and prior administrative medical findings. Doc. 9-3 at 29.

In assessing Moncrief's RFC and the extent to which his symptoms limited his function, the ALJ stated that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." Doc. 9-3 at 29–30.

In determining Moncrief's RFC, the ALJ stated that Moncrief alleged an inability to work due to seizures. Doc. 9-3 at 30. The ALJ found that Moncrief did not drive because of his seizures, that he reported "feeling hazy and having headaches" after a seizure, and that it took "about two days" to get over the headaches. Doc. 9-3 at 30. The ALJ found that Moncrief reported that he had not driven for about a year, and alleged that he had 2 car accidents—in 2014 and 2016— due to seizures. Doc. 9-3 at 30. The ALJ found that Moncrief has 3 children between the ages of 9 and 14, and that he takes care of them. Doc. 9-3 at 30. The ALJ found that Moncrief alleged 2 seizures in July 2021, 1 in August 2021, none in September 2021, 4 in October 2021, 2 in November and December 2021, and none in 2022. Doc. 9-3 at 30.

The ALJ then found that Moncrief's "statements concerning the intensity, persistence and limiting effects of the severe impairment(s) is/are not consistent with

the objective medical evidence." Doc. 9-3 at 30.  The ALJ found that "the evidence as a whole fails to confirm a disabling level of functional limitations caused by any physical or mental impairment," and that Moncrief's description of his symptoms and limitations throughout the record had "generally been inconsistent and unpersuasive." Doc. 9-3 at 30.  The ALJ found that, while it was "reasonable" that Moncrief would "experience some symptoms that would cause some exertional and non-exertional limitations, the objective medical evidence does not support a finding of disability." Doc. 9-3 at 30.

The ALJ went on to give a detailed summary of Moncrief's medical records, starting with Moncrief's emergency room visit in November 2016 due to a car accident caused by a seizure, during which Moncrief had some physical injuries but a generally normal examination.  Doc. 9-3 at 30.  The ALJ found that, during that examination, Moncrief reported that he had not had a seizure in 1.5 years, and that his brain scans were normal.  Doc. 9-3 at 30.  The ALJ found that Moncrief was prescribed Keppra and told not to drive for 6 months.  Doc. 9-3 at 30.  The ALJ found that Moncrief stated that he had not been taking his seizure medication for 6 months before the accident "because he did not like them and felt that he did not need them." Doc. 9-3 at 30.

The ALJ found that, at follow-up appointments in December 2016, January 2017, and April 2017, Moncrief had normal physical examinations and had not had

any more seizures or suffered side effects from medication since the November 2016 accident; Moncrief reported that he had only had 2 seizures in the prior 3-year period. Doc. 9-3 at 31.

The ALJ summarized Moncrief's visit to neurologist Dr. Gaston at the UAB Kirklin Clinic in February 2017, at which Moncrief reported that he had 3 seizures approximately 20 years prior while taking Wellbutrin, 1 seizure 3 years prior, and the 2016 seizure that caused the car accident. Doc. 9-3 at 31. The ALJ found that Dr. Gaston opined that Moncrief's seizures were likely "generalized tonic-clonic seizures," and that Moncrief had not had any seizures since starting Keppra, which he was tolerating well. Doc. 9-3 at 31. The ALJ found that Moncrief had a normal basic seizure workup, but a mildly abnormal EEG likely due to medication. Doc. 9-3 at 31. The ALJ found that Dr. Gaston diagnosed Moncrief with migraines, and started him on medication for his headaches in addition to levetiracetam for seizures. Doc. 9-3 at 31.

The ALJ found that Moncrief reported a seizure at a May 2017 follow-up with Dr. Gaston—which resulted in Dr. Gaston increasing Moncrief's seizure medication—but reported no further seizures at an August 2017 follow-up. Doc. 9-3 at 31. The ALJ found that Moncrief reported 2 unwitnessed seizures in December 2017 during times of increased stress, after which Dr. Gaston increased the dosage of Moncrief's seizure medication. Doc. 9-3 at 31. The ALJ found that, in March

2018, Moncrief reported 2 more seizures, so Dr. Gaston again increased his medication.  Doc. 9-3 at 31.

The ALJ found that Moncrief reported 2 more seizures in 5 months at a follow-up in August 2018, but Dr. Gaston noted that Moncrief had not completed a recommended epilepsy monitoring study because of childcare issues.  Doc. 9-3 at 31.  The ALJ found that Dr. Gaston noted "a 'strong suspicion that a lot of [Moncrief's] complaints are due to untreated depression.'"[1]  Doc. 9-3 at 31.  At a November 13, 2018 follow-up, Moncrief reported 2 seizures since August and reported sedation as a side effect of his medications, so Dr. Gaston transitioned Moncrief to LCM.  Doc. 9-3 at 31–32.  The ALJ found that Dr. Gaston noted that Moncrief had undergone an epilepsy monitoring study in October 2018 that was normal.  Doc. 9-3 at 32.

The ALJ found that Moncrief returned to Dr. Gaston for follow-ups in 2021, and that Dr. Gaston adjusted Moncrief's seizure medication to try to reduce side effects.  Doc. 9-3 at 32.  The ALJ found that Dr. Gaston discussed epilepsy surgery with Moncrief, but Moncrief was not interested.  Doc. 9-3 at 32.  The ALJ found that, at Moncrief's last follow-up with Dr. Gaston in November 2021, Moncrief reported having "a 'couple' of seizures" since June 2021, and stated that his

---

[1] Notes from the August 2018 appointment referenced by the ALJ do not appear to be present in the administrative record.  *See* Doc. 9-9.

medication was causing stomach issues; Dr. Gaston suggested a second epilepsy study, but Moncrief stated that he was unable to do the study because of his family situation.  Doc. 9-3 at 32.  The ALJ found that Moncrief's physical examinations with Dr. Gaston were normal.  Doc. 9-3 at 32.

The ALJ then summarized Moncrief's hearing testimony, finding Moncrief claimed that he had had 9 seizures in 2021 and none so far in 2022, and that he had broken his teeth and hit his head on account of 1 seizure, but that there was no treatment record for those injuries.  Doc. 9-3 at 32.  The ALJ went on to find that Moncrief had been treated by his primary care provider for migraines and depression, and had been treated for headaches by Dr. Pearlman, who prescribed additional antidepressant medication because Moncrief was "sullen and depressed." Doc. 9-3 at 32–33.  The ALJ proceeded to summarize Moncrief's visit with Dr. Kay Dantzler, a psychiatrist, for his depression, for which he continued to take Paxil. Doc. 9-3 at 33.

The ALJ described Moncrief's visit with Dr. Higgs in April 2021 for a mental status examination, at which Dr. Higgs found no significant cognitive impairment and no significant or disabling issues.  Doc. 9-3 at 33.  The ALJ found that Dr. Higgs opined that Moncrief had a moderate functional impairment in multiple areas— including the ability to maintain regular work attendance without missing more than 1 to 2 days of work per month due to psychological signs and symptoms—and mild

functional impairment in multiple other areas.  Doc. 9-3 at 33.

The ALJ summarized Moncrief's function report and the function report completed by Chance, which showed that Moncrief took care of his 3 children, was generally independent with his personal care, could follow instructions, could perform household tasks, and had a "wide range [of] daily activities," but could not drive because of his seizures.  Doc. 9-3 at 33.

The ALJ then considered the medical opinions and prior administrative medical findings.  Doc. 9-3 at 34.  The ALJ found that the opinions of the state agency medical consultants were "overall persuasive because they are consistent with and supported by the evidence due to the claimant's history of seizures, normal physical examinations, etc."  Doc. 9-3 at 34.  However, the ALJ found that Moncrief actually had more environmental limitations than those found by the state agency consultants because of his seizures and headaches.  Doc. 9-3 at 34.  But the ALJ found that there was "no evidence to support" the state agency psychological consultants' opinion that Moncrief would have difficulty dealing with the public, and that the state agency consultants included limitations that were not phrased in vocationally relevant terms.  Doc. 9-3 at 34.  Nevertheless, the ALJ stated that the ALJ considered the effect of Moncrief's impairments on his ability to perform the mental requirements of work.  Doc. 9-3 at 34.

The ALJ found Dr. Higgs' opinion "somewhat persuasive," finding that

Moncrief could perform simple work, but that there was no evidence that he could not maintain attention and concentration for at least 2 hours, would miss 1 to 2 days of work per month due to psychological issues, or would have issues maintaining his appearance.  Doc. 9-3 at 35.  The ALJ found that Moncrief takes care of his 3 children as a single parent, is independent with personal care, can follow written and spoken directions, cooks and does some cleaning (though his daughter helps), reported no issues with concentration, memory, understanding, or following instructions, and was able to pay bills and handle bank accounts.  Doc. 9-3 at 35.

The ALJ stated that the ALJ reviewed the function reports and all evidence in the administrative record in determining Moncrief's RFC.  Doc. 9-3 at 35.  The ALJ then restated Moncrief's RFC, finding that his ability to reach, finger, handle, and feel was limited by a prior wrist injury, and that he had environmental limitations due to his seizures and headaches, and limiting him to simple work without fast paced production to reduce stress.  Doc. 9-3 at 35.

The ALJ found that Moncrief was unable to perform his past relevant work as a plumber.  Doc. 9-3 at 35–36.

At step five, after considering Moncrief's age, education, work experience, and RFC, the ALJ found that there are jobs that exist in significant numbers in the national economy that Moncrief could perform.  Doc. 9-3 at 36.  The ALJ considered the testimony of the VE and found that Moncrief would be able to perform the

requirements of representative occupations such as linen room attendant, laundry worker I, and sorter I.  Doc. 9-3 at 36.  Consequently, the ALJ found that Moncrief was capable of making a successful adjustment to other work that exists in significant numbers in the national economy, and as a result had not "been under a disability, as defined in the Social Security Act, from November 25, 2016, through the date of this decision."  Doc. 9-3 at 37.

### 4.   Appeals Council decision

On February 24, 2022, Moncrief appealed the ALJ's decision to the Appeals Council.  Doc. 9-5 at 88–89; Doc. 9-3 at 5–6.  On June 30, 2022, the Appeals Council denied Moncrief's request for review of the ALJ's February 10, 2022 decision, finding no reason to review the ALJ's decision.  Doc. 9-3 at 2–6.  Because the Appeals Council found no reason to review the ALJ's decision, the ALJ's decision became the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g).

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards.  The ALJ properly assessed Moncrief's subjective testimony regarding his impairments and associated symptoms and explained the decision to discredit Moncrief's subjective testimony.

**I.    The ALJ's decision properly was based on the multi-part "pain standard."**

As an initial matter, the ALJ's decision properly was based on the multi-part "pain standard."  When a claimant attempts to establish disability through his own testimony concerning pain or other subjective symptoms, the multi-step "pain standard" applies.  That "pain standard" requires (1) "evidence of an underlying medical condition," and (2) either "objective medical evidence confirming the severity of the alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms.  *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see Raper v. Commissioner of Soc. Sec.*, 89 F.4th 1261, 1277 (11th Cir. 2024); 20 C.F.R. §§ 404.1529, 416.929 (standards for evaluating pain and other symptoms).

Then, according to both caselaw and the applicable regulations, an ALJ "will consider [a claimant's] statements about the intensity, persistence, and limiting effects of [his] symptoms," and "evaluate [those] statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant is] disabled."  20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4); *see Hargress v. Social Sec. Admin., Comm'r*, 883 F.3d 1302, 1307 (11th Cir. 2018).

Here, the ALJ's decision articulated and tracked that controlling legal standard.  In analyzing Moncrief's RFC, and the extent to which Moncrief's symptoms limited his functioning, the ALJ's decision reasoned that the ALJ "must

follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." Doc. 9-3 at 29–30. According to the ALJ, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." Doc. 9-3 at 30. After finding an underlying impairment at step one of the "pain standard" (and finding that Moncrief had severe impairments of seizures, depression, anxiety, and headaches), the ALJ proceeded to step two of the "pain standard" process. *See* Doc. 9-3 at 26–27, 30. At step two of the "pain standard," the ALJ found that Moncrief's "statements concerning the intensity, persistence, and limiting effects of the severe impairment(s) is/are not consistent with the objective medical evidence." Doc. 9-3 at 30. Thus, the ALJ's decision was based on the proper legal standards.

## II. Substantial evidence supported the ALJ's decision to discredit Moncrief's subjective testimony regarding his impairments and associated symptoms.

Furthermore, substantial evidence supported the ALJ's decision not to credit

Moncrief's subjective testimony regarding his impairments and associated pain and symptoms.

> **A.    The Eleventh Circuit requires that an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.**

Under controlling Eleventh Circuit law, an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.  *Wilson*, 284 F.3d at 1225.  A claimant can establish that he is disabled through his "own testimony of pain or other subjective symptoms."  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

An ALJ "will not reject [the claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [those] symptoms have" on the claimant's ability to work "solely because the available objective medical evidence does not substantiate [those] statements."   20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).

So, when an ALJ evaluates a claimant's subjective testimony regarding the intensity, persistence, or limiting effects of his symptoms, the ALJ must consider all of the evidence, objective and subjective.  20 C.F.R. §§ 404.1529, 416.929.  Among other things, the ALJ considers the nature of the claimant's pain and other symptoms, his precipitating and aggravating factors, his daily activities, the type, dosage, and effects of his medications, and treatments or measures that he has to

relieve the symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Moreover, the Eleventh Circuit has been clear about what an ALJ must do, if the ALJ decides to discredit a claimant's subjective testimony "about the intensity, persistence, and limiting effects of [his] symptoms." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). If the ALJ decides not to credit a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see Mitchell v. Commissioner of Soc. Sec.*, 771 F.3d 780, 792 (11th Cir. 2014) (similar). "The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable . . . [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer*, 395 F.3d at 1210 (quotation marks and alterations omitted).[2] "The question is not . . . whether [the]

---

[2] The Social Security regulations no longer use the term "credibility," and have shifted the focus away from assessing an individual's "overall character and truthfulness"; instead, the regulations now focus on "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and[,] given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Hargress*, 883 F.3d at 1308 (quoting SSR 16-3p, 81 Fed. Reg. 14166, 14167, 14171 (March 9, 2016)). But, generally speaking, a broad assessment of "credibility" still can apply where

ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Commissioner of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

**B.     The ALJ properly explained the decision not to credit Moncrief's subjective testimony regarding his impairments, pain, and symptoms, and substantial evidence supported that decision.**

The ALJ properly explained the decision to discredit Moncrief's subjective testimony regarding his pain and symptoms related to his seizures, and substantial evidence supported the ALJ's decision.

In his brief, Moncrief argues that the court should reverse and remand because "the claimant's failure to seek immediate treatment after every seizure is not substantial evidence to discredit his uncontradicted testimony and medical evidence that he has frequent and disabling seizures despite compliance with all medications," and that the medical evidence is "highly consistent with Mr. Moncrief's subjective testimony." Doc. 16 at 14–15. However, the ALJ did not rely solely on Moncrief's failure to seek immediate treatment and, considering all of the record evidence, found that Moncrief's testimony was not consistent with all of the evidence. In arriving at that finding, the ALJ not only articulated and tracked the multi-part "pain standard" (*see* Part I *supra*), but also tracked the Eleventh Circuit law and applicable

---

the ALJ assesses a claimant's subjective complaints about symptoms and consistency with the record. *Id.* at 1308 n.3.

regulations for evaluating a claimant's subjective testimony (discussed above in Part II.A *supra*).

In determining Moncrief's RFC (and citing 20 C.F.R. §§ 416.929 and 416.920c, as well as SSR 16-3p), the ALJ stated that the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," and considered any medical opinions and prior administrative medical findings. Doc. 9-3 at 29. The ALJ stated that Moncrief alleged an inability to work due to seizures, but found that Moncrief's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record"—for reasons that the ALJ explained in the decision. Doc. 10-3 at 23; *see supra* Background B.3 (ALJ decision). The ALJ went on to explicitly find that "the evidence as a whole fails to confirm a disabling level of functional limitations caused by any physical or mental impairment," and that Moncrief's description of his symptoms and limitations throughout the record had "generally been inconsistent and unpersuasive"—for reasons that the ALJ explained in the decision. Doc. 9-3 at 30.

The ALJ included information based on both objective and subjective evidence in the decision that called into doubt Moncrief's subjective testimony. *See* 20 C.F.R. §§ 404.1529, 416.929. In determining Moncrief's RFC and arriving at the

finding that Moncrief was not disabled, the ALJ provided a thorough summary of Moncrief's medical records.  Doc. 9-3 at 30–33.  In that summary, the ALJ found that Moncrief's records showed that, when he had a seizure in 2016, Moncrief reported that he had not been taking his seizure medication because he did not think he needed it, and that he had not a seizure in 1.5 years.  Doc. 9-3 at 30.  The ALJ also found that Moncrief had largely normal physical examinations, and that throughout late 2016 and 2017 Moncrief only had 3 seizures—2 of which were unreported—and tolerated his seizure medication well.  Doc. 9-3 at 31.  The ALJ found that Moncrief had an EEG that was only mildly abnormal, initially failed to complete an epilepsy unit study, and had normal results (when he did complete it).  Doc. 9-3 at 31–32.  The ALJ also found that Dr. Gaston had opined in Gaston's medical records that Moncrief's symptoms could be largely caused by depression.  Doc. 9-3 at 31.  The ALJ found further that Moncrief was not interested in epilepsy surgery and failed to complete a second epilepsy study suggested by Dr. Gaston.  Doc. 9-3 at 32.

With respect to Moncrief's hearing testimony, the ALJ found that Moncrief had no record of medical treatment for his assertion that, during a seizure, he hit his head and broke his teeth.  Doc. 9-3 at 32.  The ALJ's decision also included information about Moncrief's ongoing treatment for depression.  Doc. 9-3 at 32–33.  In terms of daily activities, the ALJ found that Moncrief was able to care for his 3

children as a single parent, could perform household tasks, and had "a wide range

[of] daily activities."  Doc. 9-3 at 33, 35.

Not only did the ALJ's decision include a lengthy and detailed recitation of

the evidence of Moncrief's condition, but also the ALJ did not entirely discredit

Moncrief's testimony about his pain and other symptoms.  Instead, the ALJ

incorporated parts of Moncrief's testimony by limiting Moncrief to medium work

and providing environmental restrictions based on Moncrief's seizures, including

requirements that he avoid heights, extreme environments, dangerous machinery,

and motor vehicles.  Doc. 9-3 at 29.  In fact, the ALJ found that Moncrief needed

*more* environmental restrictions to account for his seizures than the state agency

medical consultants suggested.  Doc. 9-3 at 34.  The ALJ also limited Moncrief to

simple work without fast paced production requirements in order to account for

stress that could increase his likelihood of seizures.  Doc. 9-3 at 35.

In short, the ALJ's decision and RFC finding accounted for Moncrief's

credible subjective testimony regarding his impairments, related pain, and other

symptoms, and included the necessary "explicit and adequate reasons" for

discrediting Moncrief's subjective testimony that he could not work on account of

his seizures.  *Wilson*, 284 F.3d at 1225.  The ALJ "considered [Moncrief's] medical

condition as a whole," and the decision was not just a "broad rejection" of

Moncrief's subjective testimony.  *Dyer*, 395 F.3d at 1210.

40

Further, the record supports the finding that there were some genuine inconsistencies or weaknesses in Moncrief's subjective testimony about his seizures such that the ALJ was not "clearly wrong" to discredit the testimony. *See Werner*, 421 F. App'x at 939. The medical and other evidence shows that Moncrief suffered from depression (*see, e.g.*, Doc. 9-8 at 74, 78, 83, 88; Doc. 9-9 at 12, 15; Doc. 9-10 at 5), which the ALJ found to be a severe impairment (Doc. 9-3 at 26). And Dr. Gaston—the epilepsy neurologist—noted a "suspicion that depression is contributing to a lot of [Moncrief's] reported symptoms." Doc. 9-9 at 23. Moncrief's medical records do not necessarily confirm his seizure disorder beyond his self-reported seizures and resulting treatment; his EEG and MRI results were largely normal (Doc. 9-9 at 32, 38; Doc. 9-8 at 83; Doc. 9-10 at 15), and his first epilepsy unit study was normal after he completed it (Doc. 9-9 at 23). Moncrief also failed to complete a second epilepsy unit study and did not express interest in epilepsy surgery. Doc. 9-11 at 18, 27.

In addition, Moncrief's testimony about the onset or frequency of his seizures had some inconsistencies. In his seizure questionnaire, Moncrief stated that he had suffered from seizures all of his life (Doc. 9-7 at 23), but he also has stated that his seizures started in 2014 (Doc. 9-8 at 78), and at one point that he suffered seizures 20 years earlier which he thought were due to taking Wellbutrin (Doc. 9-9 at 40). He also reported to his primary care physician Dr. Hunt in September 2019 that he

had suffered "up to 20 seizures" since his car accident (Doc. 9-9 at 16), but his records from Dr. Gaston appear to show far fewer than 20 seizures in that time. *See* Doc. 9-9 at 5, 21, 25.  Moncrief also previously stopped taking seizure medication because he did not like it and thought he did not need it (Doc. 9-8 at 47), and had periods of taking seizure medication with good results and no side effects (Doc. 9-8 at 42, 74, 78; Doc. 9-9 at 34).  Moncrief stated in his seizure questionnaire that he called his doctor every time he had a seizure (Doc. 97 at 23), but the record does not necessarily include evidence of physician involvement for all of Moncrief's self-reported seizures.

Function reports from Moncrief and Chance also showed that Moncrief had the ability to do many daily tasks (sometimes if he had supervision), including taking care of his 3 children, preparing meals, doing housework, taking care of pets, personal care, shopping, and mowing the grass on a riding mower.  Doc. 9-7 at 27–30, 38–41.  Moncrief's hearing testimony also included statements that he had driven within the past year despite his seizures, and that he had a seizure that was severe enough to cause him to "bust[]" his mouth and break his teeth, but that he did not seek medical attention for those issues because he had to keep his children.  Doc. 9-3 at 50, 54, 57.  The ALJ asked why Moncrief's mother-in-law, who lived very close, could not have helped, and Moncrief said that she had had multiple strokes and was 78 years old.  Doc. 9-3 at 57.  However, this appears inconsistent with the third-party

42

function report that Chance filled out, in which she stated that she provided Moncrief with extensive help taking care of the children.  Doc. 9-3 at 38–41.  While this court cannot "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner (*Winschel*, 631 F.3d at 1178), these facts, among others, show that there was substantial evidence to support the ALJ's findings of inconsistencies in Moncrief's subjective testimony.

As a final matter, Moncrief's brief also includes an argument that "the ALJ erred by not posing any hypothetical questions to the [vocational expert] regarding the frequency of the Plaintiff's seizures."  Doc. 16 at 16.  "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."  *Wilson*, 284 F.3d at 1227.  Here, any failure was harmless, as Moncrief's counsel did ask the VE about whether someone with seizures at Moncrief's alleged frequency—i.e., at least once per month that caused him to be unable to concentrate fully for at least two days, and sometimes had multiple such seizures per month—would be able to maintain employment (Doc. 9-3 at 61).  *See Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying the harmless error standard in the Social Security context).  Regardless, the ALJ did not find Moncrief's testimony about the severity of his seizures credible; therefore, there was no need for the ALJ to ask the VE questions about a hypothetical individual who suffered seizures at that

severity/frequency when the ALJ did not find that Moncrief had any such impairment. *See Wilson*, 284 F.3d at 1227.

Thus, the record includes substantial evidence to support the ALJ's RFC finding and ultimate finding that Moncrief was not disabled. As explained above, substantial evidence requires "such relevant evidence as a reasonable person would accept as adequate to support a conclusion" (*Crawford*, 363 F.3d at 1158); and the court must affirm an ALJ's factual findings if they are supported by substantial evidence, "[e]ven if the evidence preponderates against the Commissioner's findings" (*Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529)). There is sufficient evidence in the record based on which a reasonable person would accept the ALJ's findings that Moncrief's testimony regarding his impairment, pain, and symptoms was not consistent with the record as a whole, and that Moncrief was not disabled. *See Crawford*, 363 F.3d at 1158. Accordingly, substantial evidence supported the ALJ's decision. Moreover, the ALJ clearly articulated a credibility finding that was supported by substantial evidence, and as a result the court cannot disturb that finding. *See Foote*, 67 F.3d at 1562.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the Commissioner's decision is **AFFIRMED**. The court separately will enter final

judgment.

      **DONE** and **ORDERED** this March 26, 2024.

                            _____

                            **NICHOLAS A. DANELLA**
                            UNITED STATES MAGISTRATE JUDGE